# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DrugScan, Inc.<br><br>        Plaintiff,<br><br>    v.<br><br>Nicola Paparella,<br><br>        Defendant. | Civil Action No. _____ |

## COMPLAINT FOR INJUNCTIVE RELIEF
## AND MONETARY DAMAGES

**I.**     **NATURE OF THE ACTION**

Plaintiff DrugScan, Inc. ("DrugScan," "Plaintiff," or the "Company"), by and through its undersigned counsel, hereby submits this Complaint against Defendant Nicola Paparella ("Paparella") seeking injunctive relief and monetary damages.

**II.**     **PRELIMINARY STATEMENT**

1. DrugScan is a preeminent national toxicology laboratory that delivers a range of solutions to improve patient care, from medical management and drug testing to enhancing pharmaceutical drug development through Category 1 abuse-deterrent studies. For over 30 years, DrugScan has had an ongoing commitment to provide premier drug monitoring solutions with a deep scientific expertise, proprietary reporting and marketplace insight.

2. On April 9, 2018, after working at DrugScan for over four years, Paparella abruptly resigned his employment as a Senior Account Executive to begin immediately working for one of its direct competitors, Tenet Diagnostics, Inc. ("Tenet"), in an unequivocal violation of his Non-Disclosure, Assignment of Developments, Non-Competition and Non-Solicitation Agreement (the "Agreement") with DrugScan. Tenet is a direct competitor of DrugScan, and

markets itself as "committed to bringing fast, accurate, high-quality laboratory testing to hospitals, clinics, and physicians' offices." (*see* http://www.tenetdiagnostics.com/about-us/, last visited May 8, 2018).

3. Upon discovering this fact, DrugScan immediately sought to uncover the breadth and extent of Paparella's breach. DrugScan quickly learned that Paparella not only left to work for one of its direct competitors, but that he had agreed to do so nearly ***eight months*** before his resignation by signing an employment agreement with Tenet on September 1, 2017.

4. DrugScan also discovered that Paparella had moved virtually all of the major DrugScan accounts he serviced to Tenet ***while he was still employed by DrugScan***. Indeed, Paparella sent Tenet multiple emails from his DrugScan email account attaching Tenet's "New Client Forms" purporting to register DrugScan's clients as Tenet clients, all in violation of his Agreement and other legal obligations.

5. This egregious conduct is in direct violation of the Agreement, which Paparella executed as a condition of his employment with DrugScan on April 21, 2013.

6. In an effort to avoid litigation, DrugScan, through counsel, sent separate letters to Paparella and Tenet on April 27, 2018. These letters requested that Paparella and Tenet immediately cease and desist from soliciting DrugScan's clients, and that Tenet not employ Paparella in violation of the Agreement. The letters also requested Paparella and Tenet provide an explanation concerning Paparella's recruitment by Tenet to leave DrugScan, and that they confirm that they are not in the possession of DrugScan's confidential, proprietary, and trade secret information.

7. To date, Paparella has ignored DrugScan entirely. Tenet, through counsel, responded on May 4, 2018 representing that it terminated its relationship with Paparella entirely.[1]

## III. THE PARTIES

8. DrugScan is a Pennsylvania corporation with its principal place of business at 200 Precision Drive, Suite 200, Horsham, Pennsylvania, 19044.

9. Upon information and belief, Defendant Nicola Paparella is a citizen of the State of New York with a last known address of 1460 Mohawk Road, Mohegan Lake, New York, 10546.

## IV. JURISDICTION AND VENUE

10. This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as complete diversity of citizenship exists and the amount in controversy exceeds $75,000, exclusive of fees, interest, and costs.

11. This Court also has jurisdiction pursuant to the forum selection clause in the Agreement, which provides that Paparella "agree[d] to the exclusive personal jurisdiction and venue of any court in the county then containing the principal executives of the Company."

12. Venue is proper in this Court pursuant to the forum selection clause in the Agreement and because, pursuant to 28 U.S.C. § 1391, a substantial part of the events or omissions giving rise to this civil action occurred in this District.

---

[1] DrugScan reserves all rights and claims against Tenet.

## V. FACTUAL ALLEGATIONS

### A. DrugScan's Business.

13. DrugScan is a leading toxicology laboratory testing company that offers toxicology monitoring services, including drug-free workplace testing, pain-management monitoring, post-mortem testing, healthcare professional recovery monitoring, and law-enforcement drugs and alcohol testing to a variety of clients.

14. For more than 30 years, DrugScan has provided state-of-the-art toxicology testing for employers, DOT-mandated programs, law-enforcement agencies, coroners, medical examiners, substance-abuse clinics, and physicians treating patients with specific medications. DrugScan also provides technical consulting, expert witness services, litigation services, on-site rapid test kits, and testing for blood, serum, and plasma.

15. The majority of DrugScan's revenue comes from providing testing services for pain management physicians who test patients for prescription compliance. Such physicians will send or request DrugScan to pick-up specimens collected at the physicians' offices, which DrugScan will then analyze in accordance with the ordering physician's requirements.

16. DrugScan relies on its sales force, which includes Senior Account Executives like Paparella, to be the face of the Company and help maintain its strong reputation in a highly competitive market. Toward that end, DrugScan utilizes Senior Account Executives to cultivate, maintain, and grow business relationships with these clients, whether a physician or medical practice manager, and sell DrugScan's services to them on a continuing basis.

17. Senior Account Executives are thus expected to manage current accounts by regularly calling on those clients to ensure that they continue to send specimens to DrugScan for testing and analysis, ensuring that specimens are analyzed and results are reported quickly and accurately, and otherwise ensuring that client needs and concerns are addressed. Senior Account

4

Executives are also expected to solicit new business by cold-calling prospective clients, leveraging existing relationships, and pursuing DrugScan's leads. Senior Account Executives are incentivized to solicit new clients because their commissions for a given account decrease over time. Thus, an account produces the highest amount of commissions during the first three months they purchase services from DrugScan.

18. DrugScan markets its services throughout the United States and competes across the nation with other laboratory testing companies in a crowded and highly competitive field, including Tenet. Laboratory testing companies generally offer similar services and methodologies for testing and reporting and, therefore, the primary manner in which a company differentiates itself in the marketplace is by promoting its reputation for accurate, fast, and reliable testing services and providing quality customer service. To that end, DrugScan relies on its Senior Account Executives to establish and promote its reputation in the industry and maintain its high standards for customer service. Indeed, DrugScan's account executives are the front line in maintaining and growing the Company's revenue and are the primary day-to-day contact for clients.

19. Because of the high number of competitors in the industry, and to protect its client relationships and its confidential and proprietary information, DrugScan requires its sales employees, including Senior Account Executives like Paparella, to execute non-compete, non-solicitation, and non-disclosure agreements as a condition of their employment.

**B. Paparella Built Client Relationships During His Employment with DrugScan by Leveraging Its Reputation and Resources.**

20. Paparella commenced employment with DrugScan on or about April 16, 2013. As a Senior Account Executive, he was trusted and paid by DrugScan to solicit new clients and to service and maintain good, ongoing relationships with existing accounts. As part of

DrugScan's relationship with these clients, Paparella was responsible for the day-to-day contact. A Regional Sales Manager would also periodically meet with the clients and would directly manage Paparella's work. In addition to a Regional Sales Manager, DrugScan's Senior Vice President of Business Development and Customer Service would also periodically meet with the client and was ultimately responsible for all accounts across the Company's various divisions.

21. Paparella primarily worked in DrugScan's pain management compliance testing division. Since beginning his employment with DrugScan, Paparella leveraged the Company's reputation and its confidential and proprietary sales, marketing, and pricing strategies to develop a strong book of business. While he serviced a number of accounts of varying size during his years with DrugScan, he primarily focused his efforts on approximately nine major accounts he cultivated during his time with DrugScan (though DrugScan expected Paparella to obtain new clients as well).

22. These efforts paid off, and DrugScan's revenue from those accounts grew to represent approximately 11 percent of DrugScan's overall revenues from its pain management division and six percent of DrugScan's total annual revenues across the entire business.

23. Paparella's success in driving these revenues was aided by his substantial monthly expense account, through which Paparella spent an average of $6,000 per month over the last two years on business travel and client meals and entertainment, all of which DrugScan reimbursed to Paparella pursuant to its Sales Expense Policy.

24. In short, Paparella leveraged DrugScan's reputation, services, and resources for years to cultivate the large accounts that he took to Tenet – and may now be shopping to new prospective employers – in direct violation of his Agreement.

### C. Paparella Is Bound by Contractual (and Other) Non-Competition, Non-Solicitation, and Confidentiality Obligations.

25. In consideration for his employment and the benefits and opportunities provided by DrugScan, Paparella executed the Agreement on April 21, 2013. A true and correct copy of the Agreement is attached hereto as Exhibit A.

26. Paparella agreed, *inter alia*, that while employed by the Company and for one year after his employment terminated, he would not:

> anywhere in the United States . . . directly or indirectly own, manage, operate, join, control, finance or participate in the ownership, management, operation, control or financing of, or be connected as an officer, director, employee, principal, agent, representative, consultant, investor, owner, partner, manager, joint venture or otherwise with, or permit [your] name to be used by or in connection with, any business whatsoever which directly or indirectly is engaged in a "Competitive Business" with the Company.

The Agreement, ¶ 3(i).

27. "Competitive Business" is defined in the Agreement to include businesses, like Tenet, that compete directly or indirectly with DrugScan. *Id.*

28. Paparella also agreed that, while employed by the Company and for one year after thereafter, he would not:

> directly or indirectly solicit, entice or induce any Customer (as defined [in the Agreement]) to become a client, customer, OEM, distributor or reseller of any other person, firm or corporation with respect to products and/or services then sold or under development by the Company or to cease doing business with the Company, and [would] not approach any such person, firm or corporation for such purpose or authorize or knowingly approve the taking of such actions by any other person…

*Id.* at ¶ 3(ii). "Customers" include "any person or entity which at the time of termination shall be, or shall have been within two years prior to such time, a prospective or existing client, customer, OEM, distributor, licensor, licensee or reseller" of DrugScan." *Id.* at ¶ 3.

29. Under the Agreement, Paparella acknowledged that DrugScan "has invested substantial time, money and goodwill developing and marketing certain products and programs related to the laboratory testing business" and "[a]s an employee of [DrugScan], [Paparella was] given proprietary and confidential information about the products and/or programs that provide [DrugScan] with a competitive advantage over other entities which develop and market similar products and/or programs." *Id.* at ¶ 1.

30. The Agreement defines "Confidential Information" as "including but not limited to trade secrets or confidential information respecting inventions, products, designs, methods, know-how, techniques, systems, processes, software programs, technical information, works of authorship, customer lists, financial information, projects, plans and proposals and any such similar information." *Id.*

31. With respect to the Confidential Information Paparella received, he agreed that he "will not at any time, whether during or after the termination of [his] employment, reveal to any person or entity any Confidential Information [as defined in the Agreement] of [DrugScan] or of any third party which [DrugScan] is under an obligation to keep confidential…." *Id.* at ¶ 1.

32. Paparella acknowledged that the Agreement "shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania…." *Id.* at ¶ 13.

33. Paparella further acknowledged that "any breach of this Agreement by [Paparella] will cause irreparable damage to [DrugScan] and that in the event of such breach [DrugScan] shall have, in addition to any and all remedies of law, the right to an injunction, specific

performance or other equitable relief to prevent the violation of [Paparella's] obligations hereunder." *Id*. at ¶ 7.

34. The Agreement, including each of the foregoing provisions to which Paparella agreed, is supported by valid consideration, *i.e.*, his employment, and is valid and enforceable.

35. The Agreement and each of the foregoing provisions to which Paparella agreed are reasonable and necessary to protect DrugScan's legitimate interests in preserving the economic value and competitive advantage it derives from its client lists, client relationships, client-specific marketing and strategy information, and other proprietary information described above. Paparella had access to all of this information during his employment.

### D. Paparella Violated His Agreement by Transferring Accounts to Tenet While Employed by DrugScan and Then Commencing Employment with Tenet.

36. Paparella received his February commission payment on Friday, April 6, 2018. Late in the evening on Sunday, April 8, 2018, Paparella tendered his resignation by way of a curt email to his manager advising that the resignation would be effective the following day. Paparella refused to disclose where he was going or otherwise provide information about his departure. Indeed, despite working for Tenet for months, Paparella's LinkedIn page still reflects that he is a Senior Account Executive at DrugScan (*see* https://www.linkedin.com/in/nick-paparella-51aa6153/, last visited May 8, 2018).

37. Within days of Paparella's abrupt departure and without explanation, the largest accounts for which Paparella was responsible stopped sending specimens to DrugScan for analysis almost entirely. Indeed, while Paparella's accounts averaged nearly 1,300 specimens submitted for analysis each month over the preceding year, they submitted a combined total of 132 in the entire month of April.

38. In light of the brusque circumstances of Paparella's departure and the complete atrophy of business from the accounts he serviced, DrugScan accessed Paparella's DrugScan email account on or about April 13, 2018 to search for evidence supporting its growing suspicion that Paparella left for a competitor and took his DrugScan accounts with him in violation of the Agreement.

39. DrugScan did not have to look very hard. A simple review of incriminating emails carelessly left by Paparella in his DrugScan email account (some of which he tried to delete knowing his conduct was illegal) revealed that Paparella had obtained a position with Tenet, a director competitor of DrugScan that provides laboratory diagnostic services similar to those DrugScan offers. Now fearing the worst, DrugScan immediately sought to investigate the breadth and extent of Paparella's breach.

40. Through its efforts, DrugScan discovered that Paparella signed an employment agreement with Tenet (the "Tenet Agreement") on September 1, 2017, and, thus, had apparently been working with Tenet for approximately eight months before resigning from DrugScan. A true and correct copy of the Tenet Agreement is attached hereto as Exhibit B.

41. Worse still, DrugScan discovered that Paparella was stealing its clients for Tenet *while he was still employed by DrugScan*. Indeed, DrugScan found that Paparella had completed Tenet's "New Client Forms" purporting to sign DrugScan's clients over to Tenet, which forms he then emailed *from his DrugScan email account* to a Tenet employee, Beth Pugliese (who is also a former DrugScan employee).

42. Specifically, to date, DrugScan has discovered that Paparella completed and forwarded to Tenet "New Client Forms" for at least six DrugScan clients.

43. The earliest of these emails discovered to date reflects that Paparella had moved his first account from DrugScan to Tenet on February 28, 2018.[2] The remaining emails and New Client Forms were sent throughout March and early April right up until Paparella's resignation.

44. In one such email sent on March 7, 2018, relating to three of DrugScan's largest accounts serviced by Paparella, he forwarded the "New Client Forms" for each and advised Pugliese at Tenet that he wanted "to have [the clients] start sending by the end of March." He explained that Tenet would "need a private courier for these 3 offices" because the account was "big 800 plus cups and high maintenance," concluding, therefore, that "we need to make sure everything is right." Pugliese replied, "Ok great." These three accounts have stopped sending DrugScan any business since Paparella's departure. True and correct copies these emails are attached hereto as Exhibits C and D.

45. Still other emails that Paparella left behind reflected that, while he was moving clients over to Tenet behind the scenes, he was simultaneously lying to his DrugScan colleagues to slow or halt DrugScan's work on those accounts. Indeed, in another example involving the same three large accounts referenced immediately above, Paparella emailed his DrugScan colleagues on March 30, 2018, asking them to cancel courier pickups of specimens from these three accounts because the relevant physician was "away on vacation." In fact, Paparella had already moved these accounts to Tenet weeks earlier on March 7. A true and correct copy of this email exchange is attached hereto as Exhibit E.

46. These emails revealed to DrugScan that Paparella had been coordinating and colluding with Tenet to seamlessly transition all of his DrugScan accounts to Tenet for more than a month before his resignation from DrugScan, all in unequivocal disregard of the Agreement

---

[2] Paparella used his personal email address to hide his activities from DrugScan so the entirety of his email communications and any text messages sent from his personal cell phone is not yet known.

11

and other legal obligations he owed to DrugScan. Not surprisingly, four days after Paparella's resignation, a DrugScan customer service representative who worked a great deal with Paparella called one of the poached clients regarding one of the last specimens it sent to DrugScan, and Paparella, without identifying himself, actually answered the phone.

47. These circumstances and DrugScan's ongoing investigation continue to reveal the high degree of deceit and illegal behavior employed by Paparella and Tenet to solicit and steal DrugScan's clients. From what DrugScan can discern, Paparella's sole motivation was greed: the Tenet Agreement reflects that Tenet offered to pay him 30% commissions on net proceeds, a rate much higher than industry standards and akin to those utilized by competitors seeking to bypass the legitimate work of building a business by simply poaching books of business built elsewhere. *See* Tenet Agreement, ¶ 3(a) (Ex. B).

        **E.    Paparella Was Informed of His Unlawful Conduct.**

48. On April 27, 2018, DrugScan's counsel sent a letter to Paparella via email and Federal Express informing him of DrugScan's belief that he was in violation of the restrictive covenant, statutory, and common law obligations he owed to DrugScan and that, despite his egregious conduct, DrugScan would delay filing a lawsuit pending the receipt of an explanation from Paparella. A true and correct copy of the letter is attached hereto as Exhibit F.

49. Nevertheless, DrugScan also informed Paparella that time was of the essence and that if it did not receive a response by May 2, 2018, litigation would likely be unavoidable.

50. The letter was received by Paparella on April 27, 2018 by email, and on April 28, 2018 by FedEx and personal service. A true and correct copy of the Affidavit of Service is attached hereto as Exhibit G.

51. As of the filing of this Complaint, however, Paparella has entirely ignored DrugScan's letter.

## COUNT I
## BREACH OF CONTRACT

52. The preceding paragraphs are incorporated by reference as if fully set forth herein.

53. The Agreement constitutes a valid, enforceable contract supported by adequate consideration.

54. The non-competition, non-solicitation, and confidentiality provisions in the Agreement are reasonable and no greater than fairly required to protect and preserve DrugScan's legitimate interests in protecting its confidential information, goodwill, and customer relationships and contacts.

55. Paparella continues to be bound by the Agreement.

56. DrugScan fulfilled its obligations under the Agreement by, *inter alia*, agreeing to employ Paparella and providing him with Confidential Information.

57. By the conduct described above, Paparella has materially breached the express provisions of the Agreement, including, but not limited to, paragraphs 1, 3(i), and 3(ii).

58. As a direct and proximate result of Paparella's breach of the Agreement, DrugScan has suffered and will continue to suffer harm and injury, including, but not limited to, loss of trade secrets, confidential information, competitive advantage, goodwill, income, revenue, customers, and market share.

59. As a direct and proximate result of Paparella's breach of contract, DrugScan has suffered, and will continue to suffer, substantial damages.

## COUNT II
## BREACH OF FIDUCIARY DUTY

60. The preceding paragraphs are incorporated by reference as if fully set forth herein.

61. Paparella was employed by DrugScan in a position of trust and confidence and, as its employee, was an agent of DrugScan.

62. Both during and after his employment with DrugScan, Paparella owed certain fiduciary duties to DrugScan, including, but not limited to, a duty of loyalty and honesty. By virtue of these duties, Paparella was, and is, prohibited from acting in a disloyal manner, or in any way inconsistent with that trust relationship.

63. By virtue of that relationship, Paparella was and is bound to refrain from competing with DrugScan and from taking action on behalf of, or otherwise assisting, DrugScan's competitors, including Tenet, in a manner inconsistent with these duties throughout the duration of the employment/agency relationship and thereafter.

64. Paparella also was and is bound by a duty not to use DrugScan's property or confidential information for his own purposes or those of a third party.

65. Notwithstanding these obligations and duties, and in violation thereof, Paparella intentionally and knowingly failed to act in good faith and for DrugScan's benefit during and following his employment with DrugScan by engaging in conduct including, but not limited to, using DrugScan's confidential information for his and Tenet's benefit, soliciting DrugScan's customers for his and Tenet's benefit, diverting business opportunities from DrugScan, and charging expenses to DrugScan for his and Tenet's benefit related to accounts he improperly solicited for and moved to Tenet in violation of his duties, and otherwise engaging in conduct that has directly damaged DrugScan both during and after his employment.

66. Paparella's conduct has directly and proximately caused and continues to cause injury and damage to DrugScan.

## COUNT III
## UNJUST ENRICHMENT

67. The preceding paragraphs are incorporated by reference as if fully set forth herein.

68. By virtue of the acts described above, Paparella was unjustly enriched by DrugScan's reimbursement of his expenses, as well as the payment of his salary and commissions.

69. DrugScan reimbursed Paparella for expenses he alleged to have incurred while servicing clients for DrugScan's benefit.

70. DrugScan paid him a salary and commissions to work for and benefit DrugScan, not Tenet.

71. Paparella accepted the reimbursement of expenses from DrugScan for these services, even though he used these expenses to solicit clients for his new employer, Tenet.

72. DrugScan paid him a salary and commissions to work for and benefit DrugScan, not Tenet

73. By the conduct described above, it would be inequitable for Paparella to retain the reimbursement of these expenses, his salary while "working for Tenet," and his commissions "earned" to incentivize his continued efforts for DrugScan.

## COUNT IV
## UNFAIR COMPETITION

74. The preceding paragraphs are incorporated by reference as if fully set forth herein.

75. By virtue of the acts described above, Paparella has wrongfully and unfairly competed with DrugScan.

76. As a direct and proximate result of the unlawful actions, DrugScan has suffered and will continue to suffer harm and injury, including, but not limited to, loss of trade secrets, confidential information, competitive advantage, goodwill, income, revenue, clients, customers, and market share.

77. Paparella has committed these acts willfully and maliciously and for the sole purpose of inflicting harm on DrugScan or to benefit Paparella at the expense of DrugScan.

78. As a direct and proximate result of Paparella's unfair competition, DrugScan has suffered, and will continue to suffer, substantial damages.

## COUNT V
## ACCOUNTING

79. The preceding paragraphs are incorporated by reference as if fully set forth herein.

80. By virtue of Paparella's fiduciary relationship with DrugScan as its employee and the Agreement, which is a valid and enforceable contract, Paparella owed a fiduciary duty that required Paparella to account to DrugScan for all amounts received by Paparella in connection with his improper and illegal solicitation of DrugScan's clients in violation of these duties.

81. DrugScan is entitled to an accounting from Paparella and to an award of damages equal to all monies unjustly received by him as a result of his aforesaid wrongful conduct, and to damages and interest in an amount that the accounting and other proof will show.

## COUNT VI
## PERMANENT INJUNCTION

82. The preceding paragraphs are incorporated by reference as if fully set forth herein.

83. DrugScan has a clear right to relief based on Paparella's wrongful conduct and will suffer irreparable injury if Paparella is not enjoined from violating his obligations to DrugScan as set forth herein and as alleged in Counts I through VI.

84. Money damages would be inadequate to fully compensate DrugScan for the incalculable loss of its good will, client and business relationships, confidential information, and an amount of future profits that is impossible to determine, that would result from the continued wrongful acts of Paparella.

85. Greater injury will result to DrugScan if an injunction is not granted than to Paparella if an injunction is granted.

86. DrugScan is therefore entitled to a permanent injunction prohibiting Paparella from violating his obligations to DrugScan as set forth herein and in Counts I through VII.

## JURY DEMAND

DrugScan demands a trial by jury as to all claims that may be tried by a jury.

## PRAYER FOR RELIEF

WHEREFORE, DrugScan requests the following relief:

a. On the FIRST CLAIM awarding damages and interest to DrugScan in an amount to be proven at trial;

b. On the SECOND CLAIM awarding damages and interest to DrugScan in an amount to be proven at trial;

c. On the THIRD CLAIM awarding damages and interest to DrugScan in an amount to be proven at trial;

d. On the FOURTH CLAIM awarding damages and interest to DrugScan in an amount to be proven at trial;

e. On the FIFTH CLAIM, ordering a legal accounting from Paparella and the return of all monies unjustly received by Paparella, and awarding damages and interest to DrugScan in an amount that the accounting and other proof at trial will show;

f. On the SIXTH CLAIM, permanently enjoining Paparella, and anyone acting in concert with him or on his behalf, from violating Paparella's obligations to DrugScan as set forth in this Complaint or as proven at trial and enjoining Paparella from being employed by or otherwise providing services to any DrugScan customers in violation of the Agreement for a period of one year from the date of this Court's Order entering the injunction.

g. AS TO ALL CLAIMS, awarding punitive damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, costs, including, but not limited to, all costs of the investigation into Paparella's unlawful actions and granting DrugScan such other and further relief as the Court may deem just, equitable and proper.

Dated: May 9, 2018

August W. Heckman
Brian W. Sullivan
Bradley J. Crowell
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103
Tel.: (215) 963-5000
Fax: (215) 963-5001
August.heckman@morganlewis.com
Brian.sullivan@morganlewis.com
Bradley.crowell@morganlewis.com

*Attorneys for Plaintiff*
*DrugScan, Inc.*